Filed 10/29/25  P. v. Hancock CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B337106 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. XCNA384043) |
| v. | |
| MICHAEL HANCOCK, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig Richman, Judge. Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Michael Hancock appeals from the trial court's denial of his petition for resentencing pursuant to Penal Code section 1172.6 following an evidentiary hearing.[1] Hancock pleaded guilty to first degree murder committed during an eight-day string of armed robberies in 1982. The trial court found the evidence sufficient to find beyond a reasonable doubt that Hancock was a major participant in the robbery and attempted robbery leading to the murder with reckless indifference to human life. We affirm.

## BACKGROUND

### I. Procedural Background

After a lengthy preliminary hearing, Hancock pleaded guilty in 1986 to first degree murder and attempted robbery of Nasario Ortiz (§ 187, subd. (a); count 1, §§ 211, 664; count 2), grand theft (former § 487, subd. (3); count 8), and 17 counts of robbery (§ 211; counts 3, 6, 7, 9, 10, 11, 12, 13, 14, 15, 19, 21, 22, 23, 24, 25 & 26); and further admitted a principal armed enhancement (§ 12022, subd. (a)) as to all robbery counts except count 3. The court found not true the personal use of a firearm allegations as to counts 1 through 4.

In 1987, Hancock was sentenced to a term of: (1) 25 years to life for the count 1 murder; (2) a consecutive midterm of three years for the count 6 robbery, plus one year for the firearm enhancement; (3) a consecutive one-third the midterm, or one year, for the count 7 robbery; and (4) concurrent midterms for

---

[1] Undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the statute only by its current number for clarity and convenience.

the remaining counts, with the related firearm enhancements stayed pending completion of sentence.

In 2020, Hancock filed a petition in propria persona under section 1172.6 seeking resentencing for his murder conviction. The trial court appointed counsel and set an evidentiary hearing.

The trial court held the evidentiary hearing in February 2024. The court denied the petition, finding beyond a reasonable doubt that Hancock was not eligible for relief because he "was a major participant with reckless disregard."

Hancock timely appealed. (§ 1237, subd. (b); Cal. Rules of Court, rule 8.308(a).)

## II. Factual Background

For the evidentiary hearing, the trial court reviewed the preliminary hearing transcripts of Hancock and his codefendant, Alton Lefridge, Jr., which covered three days and 24 witnesses. Both Hancock and the People argued and submitted on that record without providing new evidence. We detail the facts relating only to those counts for which Hancock pled guilty.

### A. October 8, 1982 Robberies of Yukie Koyama and Yuji Kameda and Grand Theft from Yukie Koyama (Counts 4, 7 & 8)

On October 8, 1982, at approximately 11:30 p.m., Yukie Koyama and her boyfriend, Yuji Kameda, left the El Cholo restaurant on Western Avenue in Los Angeles and walked to her silver-blue BMW, about a block behind the restaurant. As soon as they got into the car, Hancock and Lefridge approached. Lefridge, who had a firearm like a shotgun, went to the driver's side, while Hancock went to the passenger side. Lefridge said, "Give me the money," with the gun pointed right next to Koyama's head through the window. Koyama gave Lefridge her purse and Kameda gave Hancock his wallet. Next, the men ordered them

3

out of the car. Hancock pulled on Kameda's shoulder, which made Koyama frightened, so they exited the car. Lefridge and Hancock got in the BMW and drove away.

**B.      October 9, 1982 Robberies of Jackie Atkins, Brenda Weber, Charles Whitaker, James Herbert, Timothy Garrett, Sally Denne, and Debra Tarczy (Counts 9–15)**

On October 9, 1982, at approximately 7:50 p.m., Jackie Atkins parked her car in front of her house on Alcott Street in Los Angeles. She noticed a metallic blue BMW parked on the corner in a red zone. As she exited her car and retrieved a package from the back seat, two men approached. Lefridge, who came to the driver's side door, pointed a shotgun at her, and the other man went to the passenger side. Lefridge demanded her purse, watch, necklace and other possessions. She complied and Lefridge passed them to the other man. They told her to get back in her car and not to move. Then they drove off in the BMW.

Shortly thereafter, at 8:00 p.m., Brenda Weber was exiting a car on Francis Avenue in Los Angeles. She was with her son, Cedric Hopson, and a friend, Charles Whitaker. As they were standing outside talking, two men approached and got on either side of the group. One man, armed with a sawed-off shotgun, demanded their money and jewelry. Weber handed over her purse and her watch. Hopson had nothing to give them, but they took Whitaker's money and jewelry as well. Weber identified the unarmed man as Hancock.

At about 9:30 that same night, James Herbert and Tim Garrett were standing on West 8th Street in Los Angeles. They were speaking to Sally Denne and Debbie Tarczy, who were seated inside Denne's car, about to leave. A car pulled up whose driver, later identified as Lefridge, was armed with a shotgun. Lefridge and the second man got out and threatened to shoot

4

Herbert and Garrett unless they turned around and stayed silent. Lefridge held the gun to the back of Herbert's head and took money from his pockets. The second man likewise took property from Garrett, including an Omega watch. The assailants also took Denne's and Tarczy's purses and jewelry. At one point, Herbert turned around and pushed the barrel of Lefridge's gun aside. In response, Lefridge hit him in the head with the shotgun. Herbert lost consciousness and fell to the ground. He was hospitalized for three days.

### C. October 12, 1982 Robbery of Warnetta Williams (Count 19)

On October 12, 1982, at approximately 9:15 p.m., Warnetta Williams was standing outside of her car with her three-year-old son inside. Two men approached. One, whom she later identified as Hancock, was holding a shotgun. They demanded her jewelry, her purse, and her keys. She complied.

### D. October 14, 1982 Robberies of Villalaz Salvador Munoz, Blanca Pineda, and Attempted Robbery and Murder of Nasario Ortiz (Counts 1–3)

On October 14, 1982, at about 9:15 p.m., Villalaz Salvador Munoz drove Blanca Pineda to her home on West 9th Street. Also in the car were Munoz's friend, Nasario Ortiz, and Munoz's eight-year-old child. Pineda and Munoz had different recollections of the events that followed.

Pineda testified Hancock and another man approached, and she identified Hancock as the man holding a rifle.[2] When the passengers exited the car, the men approached from either side.

---

[2]     We assume, as do the parties, that witness Pineda misidentified Hancock at trial and that it was Lefridge who held and shot the rifle, as the trial court found insufficient evidence to support any personal weapons enhancements against Hancock.

The man holding the rifle demanded money, and the unarmed man took Pineda's purse. Ortiz was holding a white plastic bag. Ortiz pulled out his pockets and said he had no money. Then the man holding the rifle told Ortiz to "get away a little," and shot him dead. The two men took off running.

According to Munoz, three men came up to his car when they arrived at Pineda's apartment building. Two had pistols and a third, whom he identified as Lefridge, had "something like a rifle." The three men demanded money. Munoz saw Ortiz shake his empty pockets out. Hancock and a second gunman took Pineda's purse and the white plastic bag Ortiz was holding, and ran. Lefridge remained and shot Ortiz with the rifle.

Both witnesses testified the entire incident took about five minutes. Hancock's fingerprint was discovered on the white plastic bag Ortiz had been holding.

### E. October 15, 1982 Robberies of Robert Conrad Mitchell, Lucille Patterson, Annette Bryant, Stanley Lewis, Dorothy Lewis, and Ruth Lewis (Counts 21–26)

On October 15, 1982, at approximately 8:15 p.m., Robert Conrad Mitchell left the El Cholo restaurant on Western Avenue with Lucille Patterson. As they walked toward his parked car, a black car pulled up and two men got out. The driver, whom Mitchell later identified as Hancock, pointed a shotgun at Mitchell's stomach and demanded money.[3] The other man was not armed. They took Mitchell's money and ring and Patterson's purse and jewelry, and then drove off.

---

[3]  We similarly assume Mitchell misidentified Hancock instead of Lefridge at trial as the man holding the shotgun.

At about 8:45 that same night, Stanley Lewis drove Annette Bryant to the home of Dorothy Lewis on South 8th Avenue. When he opened the car door, Lefridge and Hancock approached. Lefridge held a sawed-off shotgun to Stanley's[4] neck and told him not to look or he would "blow [him] away." Stanley turned away and Hancock told Stanley to give him his jewelry. After Stanley complied, Lefridge told him to throw his car keys under the car and run away. When Stanley started walking down the street, he felt a push in the back with the gun. Bryant stayed in the car initially, and then Hancock opened the car door and told her to remove her jewelry. After she handed it to Hancock, he walked back over to Lefridge.

At that point, Dorothy drove up and parked her car with Ruth and Kelly inside. Lefridge came to Dorothy's side armed with a sawed-off shotgun, stuck his hands in the window and unlocked the door. Putting his gun to Dorothy's temple, Lefridge demanded her purse and jewelry. Hancock approached the car and took her purse. Lefridge then demanded Dorothy's keys, threw them under the car, and both men left.

Later that evening, at about 10:45, Lefridge and Hancock led police on a high-speed chase in a stolen Mustang.[5] The chase ended when they crashed into a parked vehicle. The men fled on foot, but police found them. Police recovered three rings and a

---

[4] Since they share the same last name, we refer to Stanley, Dorothy, Ruth, and Kelly Lewis by their first names.

[5] The Mustang was stolen during a robbery on October 11, 1982, about which testimony provided at the preliminary hearing inculpated only a single robber, and was not among those counts to which Hancock pled guilty. Two additional robberies were also the subject of the preliminary hearing but did not result in charges being filed against Hancock.

watch on Lefridge's person and Garrett's Omega watch in Hancock's possession.

## DISCUSSION

### I. Applicable Legal Principles for a Petition for Resentencing under Section 1172.6

Effective January 1, 2019, the Legislature limited accomplice liability under the felony murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (Sen. Bill No. 1437 (2017–2018 Reg. Sess.).) Section 1172.6 provides a mechanism by which people, " 'who believe they were convicted of murder for an act that no longer qualifies as murder following the crime's redefinition in 2019[] may seek vacatur of their murder conviction and resentencing by filing a petition in the trial court.' " (*People v. Arnold* (2023) 93 Cal.App.5th 376, 382.)

If the trial court concludes the petition makes a prima facie showing for relief, it must issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subd. (c).) At the evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. (§ 1172.6, subd. (d)(3).) At the evidentiary stage, the trial court "may consider evidence previously admitted at any prior hearing," except for "hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of [s]ection 872," which shall be excluded from the hearing as hearsay, unless there is another hearsay exception that makes the evidence admissible. (§ 1172.6, subd. (d)(3).)

We review the trial court's denial of a section 1172.6 petition for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) "Under this standard, we review the record

8

' " " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*) The review on appeal is different from the role of the trial court in deciding the section 1172.6 petition in the first instance: "While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

## II. Evolution of the Major Participant with Reckless Disregard for Human Life Standard

Section 189, subdivision (e) provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder" if, among other things, "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (*Id.,* subd. (e)(3).)

The language in sections 190.2, subdivision (d) and 189, subdivision (e)(3), derives verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137, which upheld a death sentence against a challenge under the Eighth Amendment to the United States Constitution. (*People v. Estrada* (1995) 11 Cal.4th 568, 575.) The incorporation of *Tison*'s standard in section 190.2 brought California's capital sentencing

9

statutory law into conformity with prevailing Eighth Amendment doctrine. (*Estrada,* at p. 575.)

Subsequently, the California Supreme Court provided guidance on the meaning of the two statutory phrases "major participant" and "reckless indifference to human life." (*People v. Banks* (2015) 61 Cal.4th 788, 801–804 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522, 610 (*Clark*).) In *Banks*, the California Supreme Court explained that "*Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [(*Enmund*)] collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks,* at p. 794.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Id.* at p. 802.) And the court explained Enmund's conduct does not represent the constitutional maximum for death ineligibility; that is, *Enmund* does not establish "the most culpable one can be and yet still be constitutionally ineligible for death, such that *any* variation could move one into the death-eligible zone." (*Banks,* at p. 811.)

While *Banks* provided a list of considerations for the "major participant" prong, *Clark* identified a list of considerations relevant to the "reckless indifference" prong of the requirement. (*People v. Emanuel* (2025) 17 Cal.5th 867, 883 (*Emanuel*); *People v. Scoggins* (2020) 9 Cal.5th 667, 676, 683 (*Scoggins*).)

### A.    Major Participant

In *Banks*, the court identified the following factors a court should consider in determining whether an individual was a

major participant: "[(1)] What role did the defendant have in planning the criminal enterprise that led to one or more deaths? [(2)] What role did the defendant have in supplying or using lethal weapons? [(3)] What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? [(4)] Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? [and] [(5)] What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) The court continued, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id.* at p. 803.)

In *Banks*, the evidence placed the nonshooter defendant at the *Enmund* end of the *Tison-Enmund* spectrum as it related to the "major participation" requirement, acting solely as the getaway driver for an armed robbery. (*Banks, supra*, 61 Cal.4th at pp. 804–805.) The court explained there was no evidence the defendant there played any role in planning the robbery; no evidence he procured weapons; no evidence any of the participants had previously committed murder, attempted murder, or any other violent crime; the defendant was absent from the scene of the crime and there was no evidence he saw or heard the shooting; he had no immediate role in instigating it, nor could he have prevented it. (*Id.* at p. 805.) The court also found insufficient evidence of "reckless indifference," where

11

"nothing at trial supported the conclusion beyond a reasonable doubt that [the defendant] knew his own actions would involve a grave risk of death." (*Id.* at p. 807.)

## B.    Reckless Indifference

In *Clark*, the California Supreme Court declined to consider whether a nonshooter defendant was a major participant because the evidence was insufficient to uphold a finding that he acted with reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at p. 611.) The *Clark* court noted there was both a subjective and objective element to reckless indifference, quoting Model Penal Code section 2.02, subdivision (2)(c): " 'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark,* at p. 617.)

The *Clark* court "set out a nonexhaustive list of considerations relevant to [the reckless indifference standard], including [(1)] use of or awareness of the presence of a weapon or weapons, [(2)] physical presence at the scene and opportunity to restrain confederates or aid victims, [(3)] the duration of the crime, [(4)] knowledge of any threat the confederates might represent, and [(5)] efforts taken to minimize risks." (*People v. Strong* (2022) 13 Cal.5th 698, 706, citing *Clark, supra*, 63 Cal.4th at pp. 618–623.) The "major participant" and "reckless indifference" elements significantly overlap. (*Strong*, at p. 706; *Clark*, at p. 615.)

12

*Clark* applied this standard and the factors spelled out in *Banks* and other appellate cases to its facts. First, there was only one gun at the scene, and Clark was not carrying it. (*Clark, supra,* 63 Cal.4th at pp. 618–619.) Second, Clark was waiting across the parking lot when the shooting occurred. (*Id.* at pp. 619–620.) Third, the robbery was planned to occur after closing time, when most of the store employees were gone, and the period of interaction between perpetrators and victims was designed to be limited. (*Id.* at pp. 620–621.) Fourth, because Clark was across the street from the scene, "[he] had no opportunity to observe anything in [the shooter's] actions just before the shooting that would have indicated that [the shooter] was likely to engage in lethal violence." (*Id.* at p. 621.) Finally, there was evidence Clark made some efforts to minimize the risks of violence, such as not loading the gun or loading it with only one bullet; however, the court determined Clark's subjective risk-mitigation efforts did not necessarily foreclose an objective finding he acted with reckless indifference. (*Id.* at p. 622.) Turning to the facts, the court concluded that "there appear[ed] to be nothing in [Clark's] plan that one c[ould] point to that elevated the risk to human life beyond those risks inherent in any armed robbery," which is insufficient to show reckless indifference to human life. (*Id.* at p. 623.)

Most recently, in *Emanuel, supra,* 17 Cal.5th 867, the California Supreme Court applied the *Banks* and *Clark* standard on reckless indifference to a resentencing petition filed under section 1172.6. The court held the facts before it did not support a finding of reckless indifference, reversing the denial of resentencing. Specifically, the evidence showed Emanuel set out to commit a robbery in a public place in the middle of the

13

afternoon. He was not armed and did not know his confederate was armed or likely to use lethal force. The crime unfolded without a prolonged period of restraint. When met with unexpected resistance from the victim, Emanuel told his confederate, " 'let's go,' " and began to walk away. (*Emanuel,* at p. 896.) The court concluded his conduct in fleeing the scene without rendering aid after the shooting was ambiguous; it could have reflected a lack of regard for the victim, a desire to avoid arrest, or both. (*Id.* at p. 893.) However, as the remaining factors weighed against a finding of reckless indifference, the court concluded that standing alone, the last factor was insufficient to demonstrate reckless indifference. (*Id.* at p. 891.)

### III. Application of the Law to the Facts

Applying the law from these decisions and others to the facts from the evidentiary hearing in this case, we conclude there is substantial evidence to support the trial court's finding that Hancock was a major participant in the robbery and attempted robbery of October 14, 1982, that led to Ortiz's murder, acting with reckless indifference to human life.

#### A. Major Participant

##### 1. Role in the Planning

There is no evidence of who planned the robbery that led to Ortiz's death. However, it took place on October 14, after at least five other robberies by Lefridge and Hancock the week prior. All of the robberies for which Hancock pleaded guilty followed a similar pattern; thus, while we cannot say Hancock planned the robberies to occur this way, we can clearly infer he understood and agreed as to how they were generally going to unfold, including on the night the murder took place.

14

The modus operandi, in which Hancock repeatedly participated, was as follows. First, Lefridge carried a gun, while Hancock did not. Second, the robberies all took place in the evening, between 7:50 and 11:30. Third, Lefridge approached the driver's side of a parked car while its occupants were exiting or entering, and Hancock generally approached the passenger side. Fourth, Lefridge told the victims they were being robbed, at which time he and Hancock demanded their valuables. Fifth, both men collected the items and fled.

Hancock argues Lefridge was the leader during the robberies and Hancock was no more than a subordinate aider and abettor to Lefridge. But "[a] major participant need not be the ringleader." (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.) And the question whether Hancock was no more than a subordinate aider and abettor requires a review of all the factors. Here, the multiple robberies Hancock and Lefridge had recently committed together put Hancock on notice of the plan for the robbery that led to Ortiz's murder, including the use of a lethal weapon. This factor weighs in favor of finding Hancock was a major participant.

### 2.     Supplying or Using Lethal Weapons

There is no substantial evidence Hancock either supplied or used the weapon that killed Ortiz. While one witness, Pineda, testified Hancock did have a weapon, the People did not pursue that theory at the preliminary hearing and the trial court found the allegation not true. Hancock's plea did not admit any firearm enhancement as to the murder or attempted robbery of Ortiz. This factor weighs against finding Hancock was a major participant.

15

### 3. Awareness of Dangers Posed by the Nature of the Crime, Weapons Used, or Past Experience of the Other Participants

Again, their recent string of robberies together put Hancock on notice that Lefridge would be armed with a sawed-off shotgun—a highly lethal weapon. He was also aware Lefridge was willing to use it. On at least one occasion, Lefridge used the weapon to knock a victim unconscious. However, there is no evidence Hancock knew Lefridge would actually shoot Ortiz. Hancock also knew the robberies would be carried out at night. One of the witnesses, Munoz, placed an additional gunman at the robbery, but there is no evidence as to whether that additional gunman made the crime more or less potentially dangerous. Nonetheless, given Hancock's knowledge that Lefridge would be armed with a sawed-off shotgun at night and was willing to subject his victims to extreme violence, this factor weighs in favor of finding Hancock was a major participant.

### 4. Presence at the Scene of the Killing, or in a Position to Facilitate or Prevent the Murder

Hancock was present for and actively participated in the attempted robbery of Ortiz. Among other things, his fingerprint was found on the white bag Ortiz had been holding. It is true Hancock (and the additional robber, if there was one) had stepped away from the victims' car when Lefridge told Ortiz to move away and then shot him. Hancock argues this factor weighs against finding he was a major participant, since he was running away when the gun was fired. However, all the robbers left together in the same vehicle when they fled, so Hancock cannot have been too far away when the killing occurred. And he was

16

present during the encounter up to the killing. He was certainly not, for example, waiting across the street in a getaway car with no knowledge of the events as they were transpiring. We cannot say this factor weighs in favor or against finding Hancock was a major participant.

### 5. What the Defendant Did After the Killing

After the shooting, Hancock fled in the same vehicle with Lefridge. Hancock did not turn around or offer help to Ortiz.

The very next night, Hancock and Lefridge committed two more armed robberies together, involving six new victims, using the same modus operandi. For these subsequent robberies, Lefridge was still armed with the shotgun, and pointed it at a victim's stomach, at another's neck and another's temple, while Hancock demanded or took valuables. This factor weighs heavily in support of a finding that Hancock was a major participant.

### 6. Totality of the Circumstances

Reviewing the factors in this nonexhaustive list and the totality of the circumstances, we have no trouble concluding the evidence supports the trial court's finding that Hancock was a major participant in the attempted robbery that led to Ortiz's death. Rather than a mere "subordinate aider and abettor," Hancock was integral to the entire armed robbery scheme even though he was not the one holding the gun. While Lefridge held the gun, Hancock demanded and took valuables from the victims, and then fled with Lefridge. With two men, there was less of a chance for the victims to escape or fight back. Hancock knew the plan well, and was a central participant in it on at least five occasions before the robbery that led to Ortiz's death.

Nor was Hancock so surprised or repelled by Lefridge shooting Ortiz that he discontinued their criminal partnership.

17

Instead, Hancock participated in two more robberies the next night, using the same modus operandi and even the same weapon that killed Ortiz. The partnership ended only as a result of their arrest.

Hancock's role in the robbery was clearly more substantial than those defendants found not to have been major participants, such as in *Enmund* and *Banks*. In *Enmund*, the defendant actually planned the robbery, but he was not present and was waiting in a getaway car when the unplanned murder occurred. (*Enmund, supra,* 458 U.S. at p. 788.) In *Banks*, the defendant was absent from the scene of the robbery, sitting in a car and waiting, with no evidence that he heard or saw the shooting. (*Banks, supra, supra*, 61 Cal.4th at p. 805.) In contrast, Hancock participated in multiple armed robberies, including several on the same night, which he either helped to plan or knowingly took part in, playing a central role in taking the valuables while his violent partner wielded a lethal weapon.

### B. Reckless Indifference

#### 1. Use of or Awareness of the Presence of Weapons and Knowledge of Cohort's Likelihood of Killing

As noted above, there is no substantial evidence Hancock used weapons in the commission of the attempted robbery. He was, however, aware Lefridge was armed with a lethal weapon in the robbery on October 14, 1982, and in the preceding robberies. (*Cf. Emanuel, supra,* 17 Cal.5th at p. 885 ["no evidence in the record demonstrating that, prior to the robbery, Emanuel knew [the killer] possessed a gun, would bring that gun to the robbery, or was likely to use lethal force"].) Hancock was also aware Lefridge had used the shotgun to knock a previous victim

18

unconscious. This put Hancock on notice that Lefridge was capable of violence that could cause great bodily injury, if not death. There is no evidence Hancock thought the weapon was unloaded. On the other hand, there was no evidence Hancock had prior knowledge Lefridge would shoot the weapon. Nevertheless, this factor weighs in support of a finding of reckless indifference.

### 2. Duration of the Crime

The robbery that culminated with Ortiz's death lasted about five minutes. "Courts have considered 'whether a murder came at the end of a prolonged period of restraint of the victims by defendant' in analyzing the defendant's culpability." (*Scoggins, supra,* 9 Cal.5th at p. 680, quoting *Clark, supra*, 63 Cal.4th at p. 620.)

The robbery was relatively short in duration, although it did involve several victims who were each told to hand over their valuables, one of whom emptied his pockets to show he did not have anything in them. This apparently angered Lefridge who told him to "move away," and then shot him at close range. This factor weighs against a finding of reckless indifference.

### 3. Efforts Taken to Minimize the Risk of Violence

Contrasted with *Clark, Scoggins* and *Emanuel*, the record here does not reflect Hancock made efforts in advance to minimize the risks of violence. (Cf. *Emanuel, supra*, 17 Cal.5th at p. 895 [Emanuel unarmed during robbery at a public park in the middle of the afternoon]; *Scoggins, supra,* 9 Cal.5th at p. 683 [Scoggins's plan was for a daytime confrontation in a public parking lot without the use of weapons]; *Clark, supra,* 63 Cal.4th at pp. 621–623 [Clark and his confederates waited until after a

19

store was closed before they robbed it; there were not supposed to be any bullets in the gun; and the gun only had one bullet in it].)

Here, while there was no direct evidence Hancock played a role in planning the robbery leading to Ortiz's death, he participated in at least six robberies up to and including that one. So the evidence shows Hancock willingly participated in a string of nighttime robberies in parking lots or driveways open to the public but where the light was dim. The record does not reflect how many people were, or were likely to be, present at the time of the incident. There was no evidence Hancock knew Lefridge was likely to shoot someone, but there was evidence Hancock knew Lefridge was willing and able to commit violence with the weapon sufficient to inflict great bodily injury. There was no evidence the gun was just for show or that the gun did not or was not supposed to contain bullets. As there is no evidence Hancock attempted to mitigate any dangers, this factor weighs in favor of a finding of reckless indifference.

4. **Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims**

It is uncontested that Hancock was physically present during the robbery, although he was leaving the scene at the time Lefridge shot Ortiz. Nonetheless, Hancock's fingerprint was on the white bag Ortiz turned over at the robbery, and Hancock was present when Ortiz pulled out his pockets and said he had no money. Before Lefridge shot Ortiz, Lefridge told him to "get away a little." Hancock and Lefridge left the scene in the same vehicle.

" 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps,

20

or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' " (*Emanuel, supra*, 17 Cal.5th at p. 889, quoting *Clark, supra,* 63 Cal.4th at p. 619.)

Hancock was at the scene and it is reasonable to infer he was aware of the risk of impending lethal violence once Ortiz indicated he had no money, or when Lefridge told Ortiz to get away a little. There is no evidence Hancock told Lefridge to let Ortiz be, even after Ortiz turned out his empty pockets. (Cf. *Clark*, *supra,* 63 Cal.4th at p. 621 ["Nor did defendant have an opportunity to observe [the shooter]'s response to [the victim's] unanticipated appearance or to intervene to prevent her killing."].)

In any event, "[t]he essential question underpinning our analysis is not whether [the nonshooter] did enough to stop [the killer's] unplanned act of violence; it is whether [the nonshooter] acted with the requisite mens rea, i.e., reckless indifference to human life. The focus should not be on the ultimate *efficacy* of his actions, but on what his actions reveal about his mental state." (*Emanuel, supra*, 17 Cal.5th at p. 891.)

This factor weighs slightly in favor of a finding of reckless indifference. On the one hand, Hancock was at the scene and saw the events leading up to the shooting yet made no attempt to

21

intervene; on the other, he was in the process of leaving when the shooting occurred.

### 5. Hancock's Age Does Not Mandate Reversal

Hancock argues that, although he argued the issue to the trial court in his evidentiary brief, the trial court erred in failing to explicitly account for his age (23) in determining whether he acted with reckless indifference.

While the California Supreme Court has not yet addressed this factor, some appellate courts have found a defendant's youth relevant to the reckless indifference analysis. (*Emanuel, supra, supra*, 17 Cal.5th at p. 885, fn. 6, citing cases.) For example, in *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–417, the court acknowledged numerous appellate decisions treating a defendant's youth, defined roughly as 25 years or younger, as a factor within the totality of the circumstances relevant to the requisite mental state for felony murder. Those cases reason that, in light of our evolving understanding of adolescent brain development, "it is far from clear [whether a juvenile could be] actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants.' " (*People v. Harris* (2021) 60 Cal.App.5th 939, 960.)

Hancock notes the record does not show the trial court considered his age. However, nor does the record show the opposite. "Absent evidence to the contrary, we presume that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) All the caselaw Hancock cites predates the February 2024 evidentiary hearing at which the trial court made its ruling.

Substantial evidence supports the trial court's implied finding that Hancock's age at the time of his crimes does not overcome the other factors supporting a finding of reckless indifference.

First, "the presumption of immaturity weakens as a defendant approaches 26." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.) Second, as in *Oliver,* the differences in brain development cited in the caselaw which can affect a youthful offender's mental state do not apply given the facts in this case. (*Ibid.*; see also *Miller v. Alabama* (2012) 567 U.S. 460, 471.) Here, rather than impulsivity or vulnerability to peer pressure, the evidence shows a pattern of robberies committed with the same deadly weapon, both before and after the event leading to Ortiz's death. The murder did not happen during a single impulsive event but as one in a series that took place over a week. There is no evidence any kind of peer pressure was applied to Hancock. Hancock argues that Lefridge was the leader, because he carried the shotgun, drove the cars, took the lead in approaching the victims, and engaged in all the violence. Even so, there is no evidence Hancock felt compelled to assist Lefridge in these robberies or felt pressure to join him, rather than simply making a bad decision. (Cf. *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 [detailing evidence that a 15-year-old defendant was influenced by peer pressure].) There is no evidence Hancock wanted to end his relationship with Lefridge after any of the robberies. This factor is neutral.

### 6.     The Totality of the Circumstances

Weighing all the factors above and the totality of the circumstances, the trial court did not err in concluding the evidence supported a finding of deliberate indifference beyond a

reasonable doubt. If there were any doubt about Hancock's state of mind before he committed the robbery and attempted robbery leading to Ortiz's death, it was put to rest by Hancock's continued participation in further robberies the very next night using the same modus operandi, including the lethal sawed-off shotgun. Hancock's youth does not weigh to the contrary, where he can point to no evidence that he felt pressured or was forced to participate, or that he acted impulsively in going along with Lefridge. That he continued to commit more robberies after Ortiz's murder shows Hancock was indifferent to whether the crimes he committed with Lefridge ended in the taking of a person's life, the precise question the trial court was required to consider.

## DISPOSITION

The order is affirmed.


RICHARDSON, J.

I CONCUR:


GOORVITCH, J. *

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**B337106**
*People v. Hancock*
**CHAVEZ, Acting P. J., Concurring.**

I concur in the judgment only.


CHAVEZ, Acting P. J.


1